UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THOMAS CHERNESKY,

     Plaintiff,

v.                                                    Case No.:  2:21-cv-399-SPC-NPM

CITY OF CAPE CORAL,

     Defendant.

_____/

## **OPINION AND ORDER**[1]

     Before the Court are Defendant City of Cape Coral's Motion for Summary Judgment (Doc. 25), Plaintiff Thomas Chernesky's Response (Doc. 32), and Cape Coral's Reply (Doc. 35).  The Court grants the motion.

## **BACKGROUND**

     This is a disability discrimination case brought under the Family Medical Leave Act ("FMLA") and the Florida Civil Rights Act ("FCRA").  The facts are largely undisputed, and the Court notes where conflicts exist.

     Chernesky worked as survey manager for the public works department of Cape Coral ("Cape Coral" or "City").  He had supervisory, budgetary, and

---

[1] Papers hyperlinked to CM/ECF may be subject to PACER fees.  By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them.  The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

oversight responsibilities, along with maintaining the City's publicly available benchmark geodetic database.   For the uninitiated, this is a system of permanent and temporary benchmarks—concrete monuments or other markers—that provide elevation information from which elevation certificates can be obtained for purposes including development, construction, and flood insurance.   Chernesky exclusively controlled the application through which the public could access the benchmark network, but Cape Coral's survey department possessed the underlying information.   (Doc. 25-2 at 11, 43).

During his employment with Cape Coral, Chernesky experienced severe back pain.   He had a two-level lumbar fusion in 2015, after which the City approved his FMLA leave and provided him remote computer access so he could work from home while he recovered.   But the surgery did not resolve his back pain.

Mike Ilczyszyn became Cape Coral's senior public works manager in 2018.   In that capacity, he reviewed unscheduled leave throughout the public works department.   This department-wide review revealed that Chernesky "was exceeding the [number] of hours that were allowable under [the City's] professional organization to be fit for duty."   (Doc. 30-2 at 6-7).   Ilczyszyn met with Chernesky to discuss in spring 2018.   Ilczyszyn explained he was keen to assist Chernesky and offer him whatever support and assistance the City could provide.   Ilczyszyn was motivated to prevent Chernesky from getting wrapped

up in disciplinary proceedings that could result from unchecked absenteeism. (Doc. 30-2 at 6-7.) Chernesky perceived this meeting quite differently; he felt (1) Ilczyszyn pressured him to discuss his medical condition, (2) caught him by surprise, and (3) Ilczyszyn had no right to make these inquiries. (Doc. 25-2 at 33-34). Despite his concerns, Chernesky sought and was granted FMLA leave. (Doc. 25-4 at 2).

But the situation worsened. In September 2018, Ilczyszyn and Jill Ramirez (Cape Coral's then-benefits manager) met with Chernesky about his excessive absenteeism. Ilczyszyn memorialized the meeting by email to Paul Clinghan (the public works director), Ramirez, and Daylana Burdier (the benefits coordinator). The email stated Ilczyszyn and Ramirez expressed concern about Chernesky's excessive absences; explained that the public works department was implementing a new policy for tardiness and unexcused absences; conveyed that once that policy was in place, Chernesky may face disciplinary issues if he had not obtained FMLA leave for his absences; noted the department's recent approval of remote computer access upon request; and explained how Chernesky could best use FMLA leave to avoid further issues.

Ilczyszyn's email stated Chernesky "suggested he was being singled out as an employee and didn't see why [his absences were] a problem," that Chernesky "began to raise his voice," and that Chernesky "said he [was] not going to use [remote access]." (Doc. 30-3 at 52). Chernesky's email response

3

to the meeting was attached. In it, Chernesky conveyed he "completely [understood] FMLA and how it should be applied," and he asked to "see all other [Public Works] Managing Personnel 'requested time-off records', for consistency." (Doc. 30-3 at 53). He also produced his own records of his time off for the five months before the meeting, and he stated, "If this [amount of time off] is considered excessive, I would like the policy defined as to what is or isn't considered excessive, so I can accurately and definitively schedule any necessary time off."[2] (Doc. 30-3 at 53).

Chernesky had a second back surgery in late 2018, for which he sought FMLA leave. The City granted that leave request, and in the months that followed, Chernesky was on intermittent FMLA leave. Chernesky's treating physician regularly submitted medical forms to support Chernesky's FMLA status. On these forms, when asked whether Chernesky "need[ed] to . . . work part-time or on a reduced schedule because of [his] medical condition," the doctor answered "yes." (Doc. 30-2 at 43 (February–April 2019); Doc. 30-2 at 49 (May–July 2019); Doc. 30-2 at 51 (August–October 2019)). The doctor was then asked to "[e]stimate the part-time or reduced work schedule the employee needs, if any," and he responded, "6 hours per day; 3-5 days per week." (Doc. 30-2 at 43, 49, 51). And he stated Chernesky's condition could periodically

---

[2] Chernesky's time records did not jibe with the City's time records. (Doc. 30-3 at 23).

cause episodic flare-ups that prevented Chernesky from performing his job function, and during which it would be medically necessary for Chernesky to be absent from work.  (Doc. 30-2 at 43, 49, 51).  The doctor estimated the possible frequency of these flare-ups to be 2 times per week, and he estimated the duration of each episode to be 1–2 days.  (Doc. 30-2 at 43, 49, 51).

For a substantial portion of 2019, the City's benefits staff and Chernesky went back and forth about how to implement the intermittent FMLA leave his documentation seemed to require.  By email, Ramirez stated that although his doctor "suggested a reduced work week, [Chernesky] would prefer to continue his current intermittent FMLA leave structure: 1 occurrence each week lasting up to 1 day for flare-ups."  (Doc. 30-7).  Chernesky maintains this is an unnecessarily rigid structure that does not account for the unpredictability of his condition.  Ramirez noted that based on simple arithmetic, following his doctor's recommendations, and without some schedule in place, Chernesky could be working only 6 hours each week, at which point he would have to be placed on full-time (rather than intermittent) FMLA leave.

Ultimately, based on Chernesky's treating doctor's forms, the City's attorney and outside FMLA counsel advised that Chernesky needed a reduced schedule. (Doc. 30-3 at 28-29).  But Chernesky argued nothing changed and he did not need to work a reduced schedule.  This is a major point of contention that had the parties at loggerheads.  Chernesky maintained that both his

medical condition and the doctor's recommendations were unchanged, but the City suddenly altered its treatment of Chernesky's time off.   The City maintained it was following the doctor's stated recommendations with the advice of counsel.

When Ilczyszyn and Burdier met with Chernesky about his reduced schedule, Chernesky contended the attorneys misinterpreted his doctor's orders.  But Chernesky refused either to contact his doctor to correct or clarify the forms or to authorize Ramirez to contact the doctor on his behalf.

Meanwhile, Cape Coral was experiencing an unprecedented building boom.  But according to Clinghan, the survey group was "dysfunctional" under Chernesky's leadership.  (Doc. 30-1 at 15).  Clinghan stated he was unhappy with Chernesky's job performance, and the survey department was being compromised by Chernesky's failure to complete his work.  In a January 17, 2019 email, Ramirez documented a meeting she had with Ilczyszyn about Chernesky's performance issues.  She states:

> [Chernesky's] performance is consistently poor in that he is missing timelines and his overall work is poor . . . . [Ilczyszyn] and I discussed one example and I concurred that the issue cannot be related to [Chernesky's] FMLA as the deadline established for the project included [Chernesky's] FMLA time off.  Yet [Chernesky] still missed the deadline for the project . . . . Unfortunately there are multiple examples that can be used that are similar to this scenario.

(Doc. 30-2 at 36).  Ilczyszyn and Ramirez discussed strategies on approaching Chernesky about his performance issues and improving the situation.[3]  (Doc. 30-2 at 36).

In October 2019, things came to a head.  First, on October 11, Chernesky told Ilczyszyn he would soon have major surgery and would be going on medical leave in mid-December, which could last for three months or more.  (Doc. 25-2 at 178).  On October 17, Clinghan, Ilczyszyn, and Stephanie Smith (the Design & Construction Division Manager) called a meeting with Chernesky in which they told Chernesky they planned to realign the survey department.  (Doc. 25-2 at 178).  In a memo drafted two days after the meeting, Chernesky explained he interpreted this realignment as an attempt to "humiliate [him] through a demotion" and a "blatant attempt to try and make [him] resign."  (Doc. 25-12).  He concluded: "To be extremely clear—**I Do Not accept this Demotion**."  (Doc. 25-12).

---

[3] Besides issues with Chernesky's productivity, his colleagues described his workplace demeanor as inappropriate in several respects.  Through contemporaneous emails and deposition testimony, Chernesky is described as "angry," (Doc. 30-3 at 22, 26), "hostile," (Doc. 30-3 at 22, 27), "hostile, negative, bullish," (Doc. 30-3 at 27), "rais[ing] his voice," (Doc. 30-1 at 36), "yelling" at coworkers, (Doc. 30-2 at 12), "refus[ing] a direct order," (Doc. 30-2 at 18), and "verbally attack[ing] a department head," (Doc. 30-2 at 18-19).  Ramirez stated several times that she felt threatened by Chernesky—sometimes physically so.  (Doc. 30-3 at 22, 26-27).  She opined Chernesky was never professional, and she stated that he acted inappropriately in the workplace, with "harassment, bullying, and hostility."  (Doc. 30-3 at 26).  She explained, "I tried to explain [the City's FMLA policy] to Mr. Chernesky numerous times—with witnesses, because I was afraid of him."  (Doc. 30-3 at 26).

The next day, October 18, Chernesky officially notified Ilczyszyn of his impending leave. (Doc. 30-5). Also on October 18, Chernesky drafted a memo about the City's published geodetic vertical control (benchmark) network. (Doc. 30-1 at 35). Although Chernesky did not call Clinghan by name, he was the focus of the memo. Chernesky stated that Clinghan had been working as public works director for around three years, and shortly after he began in that role, he removed survey personnel responsible for maintaining and proliferating the benchmark network. Chernesky wrote that, even though past projects had damaged the stability of the benchmark network, and despite compounding discrepancies in the published benchmarks, Clinghan had been deaf to Chernesky's years of asking for support for maintaining and publishing the network. "[Clinghan] consistently chose not to assist with this long-standing effort." (Doc. 30-1 at 35).

Chernesky's memo continued: "It comes with great regret that I can no longer state that this Network is safe to publish." (Doc. 30-1 at 35). He explained the over 7,000 temporary benchmarks would be unavailable for the foreseeable future, but the approximately 165 permanent benchmarks would be available from the survey division and on the City's website.

For his part, Clinghan states Chernesky's characterization of his role vis-à-vis the City's survey personnel is "totally untrue," and he adds, Chernesky "had complete control over all of his survey personnel." (Doc. 30-1 at 11).

What's more, Clinghan disputes Chernesky's portrayal of the viability of the benchmark system, noting the City's current licensed land surveyor is "very comfortable" with the network, believes it is "safe to publish," and has identified fewer than a dozen problematic temporary benchmarks that the City has removed from the system.  (Doc. 30-1 at 11-12).

The department realignment was made official on October 21.  Under the new structure, Chernesky remained responsible for commercial and residential on-demand plat reviews, which could be performed only by a licensed land surveyor, like Chernesky.  Other survey functions were shifted to the construction and design division.  Chernesky perceived this to be a demotion, mainly because he no longer had supervisory responsibilities. [4]

But the City describes the realignment much differently.  Ilczyszyn explains the realignment of the survey department was a product of his review of the public works department, as a whole.  That process continued with three additional realignments, all of which redistributed fiscal and human resources to improve efficiency and put resources where they were most needed.  Ilczyszyn emphasizes that Chernesky "never experienced any material change in the terms, conditions, or privileges of his employment," and his "job title, job classification, rate of pay, and benefits did not change."  (Doc. 25-8 at 4-5).

---

[4] Before the realignment, Chernesky supervised six field personnel.  (Doc. 30-2 at 5).

And when asked about the realignment's effect on Chernesky's status as manager, Ilczyszyn was unequivocal: Chernesky remained a manager "[i]n pay and in title and in function." (Doc. 30-2 at 6). Chernesky no longer had direct supervisory responsibilities, "but he still had to manage all the processes, the reviews, external contracts, prepare documents, [and] certify plats. I mean, he still was—he absolutely was a manager." (Doc. 30-2 at 5).

By October 18, Chernesky had concluded the online benchmark information was untrustworthy, and he drafted his memo communicating his decision to stop publishing the information. But he waited to send his memo until November 4—two weeks after the department realignment—when he emailed it directly to Clinghan, Ilczyszyn, and others. (Doc. 25-2 at 205-06).

Chernesky explains his decision about the trustworthiness of the benchmark information coincided with some unidentified technological issues that made the network inaccessible online. (Doc. 25-2 at 42). Around October 30, Smith and Ilczyszyn approached Chernesky to ask whether he knew the network was offline and needed attention. He "indicated he was unaware the link was broken and had [no] idea why it was offline." (Doc. 25-2 at 207). Ilczyszyn instructed Chernesky to restore the link and to work with IT so he would not be the only person who could fix accessibility issues.

In a follow-up meeting on November 5 (*i.e.*, one day after Chernesky finally emailed his benchmark-network memo), Ilczyszyn and Smith met with

Chernesky again.  Ilczyszyn "specifically asked [Chernesky] if he had restored the link to the [benchmark network] and [he] said 'No.'  [Ilczyszyn] then asked [Chernesky] if he had any intentions on following [his] instructions and [Chernesky] said 'No.'  [Chernesky] did assert this was his web app that he built and he wasn't going to give [the City] the data so it could be used against him." (Doc. 25-2 at 207).   The benchmark network remained offline, and Chernesky refused directives to restore it, even though he exclusively controlled the application through which the benchmark network was provided to the public.  (Doc. 25-2 at 11, 43).

Chernesky denies that he removed the data and that he refused to restore it.  But the City ultimately concluded that Chernesky unilaterally "withheld" the benchmark network from view and insubordinately refused to comply with expressed directives to work with staff to restore the network and correct any known errors.  (Docs. 25-13; 25-14).  It is unclear from the parties' filings how and when the benchmark network was ultimately restored, but Chernesky states it had not happened by the date of his termination.  (Doc. 25-2 at 43).

Chernesky received a pre-disciplinary notice on November 12.  Clinghan authored the notice and, among the reasons for discipline, he cited Chernesky's (1) failure to meet the performance expectations of his role, (2) failure to maintain the benchmark network, (3) unilateral decision to withhold the

benchmark network from view online, (4) refusal to follow directives to work with staff and restore the network, and (5) circulation of his email complaining about Clinghan's leadership. (Doc. 25-13). Chernesky was offered and waived his right to a pre-disciplinary hearing. On November 25, he was terminated.

Chernesky argues his reduced work schedule, the department realignment (which he considers a demotion), and his termination were all "because of [his] Disability and use of FMLA" (Docs. 3; 25-2 at 183-84). Clinghan and Ilczyszyn both said Chernesky did not make this charge contemporaneously. (Docs. 25-7 at 4; 25-8 at 5).

Chernesky also points to other instances that made him feel he was being discriminated against for his medical condition. They include: overly inquisitive questions from the public works planning manager about Chernesky's 2018 back surgery; rudeness from the human resources director, who cancelled a meeting with Chernesky after he objected to the department realignment; the public works manager assigning Chernesky to participate in a citizen-relations bus trip; the failure of the public works design and construction manager to re-stripe the parking lot to restore it to a previous configuration; and Clinghan putting a lockbox on the thermostat. (Doc. 25-2 at 176, 183-84).

The City maintains it never denied or interfered with Chernesky's rights under the FMLA, nor did it retaliate against him for exercising those rights.

It contends Chernesky's termination resulted from his performance issues and insubordination.   And it now asks the Court for summary judgment on Chernesky's claims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  If "the movant adequately supports its motion," the nonmoving party must show "specific facts exist that raise a genuine issue for trial."  *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321 (11th Cir. 2014) (citation omitted).

Courts view evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002).  All inferences are part conjecture.  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982).  But an "inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."  *Id.* at 1324. And "a mere scintilla of evidence" does not a genuine issue of material fact

make, so a nonmoving party may not simply say, "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (cleaned up).

## DISCUSSION

Chernesky sued the City under three theories: FCRA Discrimination (Count 1), FMLA Interference (Count 2), and FMLA Retaliation (Count 3). Because there is no direct evidence of discrimination, the Court applies the *McDonnell Douglas* framework to Chernesky's retaliation and discrimination claims.[5]   But first, the Court addresses Chernesky's interference claim, to which a different standard applies.

### A.  FMLA Interference

The FMLA protects employees from interference with the exercise (or attempted exercise) of their substantive rights under the statute.  *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1247 (11th Cir. 2015).  To establish an FMLA interference claim, the plaintiff must show "that his employer denied or otherwise interfered with his substantive rights under the [FMLA]." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).  The "plaintiff is not required to establish the employer's intent but instead 'need only demonstrate that he was entitled to

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

but denied the right' to FMLA leave." *Herren v. La Petite Acad., Inc.*, 820 F. App'x 900, 905 (11th Cir. 2020) (quoting *Strickland*, 239 F.3d at 1208).

If employee makes that showing, employer may then demonstrate that it would have taken the same, complained-of action "for a reason wholly unrelated to the FMLA leave." *Id.* (citation omitted). On that issue, employer bears the ultimate burden of persuasion, and it must establish the lack of a causal connection between employee's request for leave and employer's action. *See id.* at 906 (discussing interference vis-à-vis termination).

The City argues it never limited, interfered with, or denied any benefit to which Chernesky was entitled under the FMLA. Not so, says Chernesky. He contends although the City allowed him to take FMLA leave, it unlawfully implemented that leave by artificially restricting his leave rights and ultimately forcing a reduced work week upon him. Chernesky objects to communications he had with Clinghan and Ilczyszyn in which they asked about his medical condition; he argues at worst this interfered with his rights to confidentiality, and at best it "reflect[ed] management's fixation and concern with Plaintiff's use of FMLA leave." (Doc. 32 at 15-16). Finally, Chernesky argues his "demotion" constituted interference with his FMLA rights because the realignment came one week after he informed Ilczyszyn he would be taking an extended FMLA leave.

The undisputed evidence shows that, between 2015 (when Chernesky had a two-level lumbar fusion) and 2019, the City diligently pursued a solution that met Chernesky's needs (as documented by his treating physician) and satisfied its obligations under the FMLA. As a starting point, the City never denied a request for FMLA leave. (Doc. 25-4 at 2). And though Chernesky did not agree with the City's interpretation of his doctor's opinion (*i.e.*, that Chernesky required a reduced work schedule of "6 hours per day; 3-5 days per week" and that he could be absent for 1–2 days, 2 times per week for episodic flare-ups (Doc. 30-2 at 43, 49, 51)), the City took the documentation Chernesky provided, consulted its attorney and outside FMLA counsel, and implemented the advice it received.

This prolonged and diligent effort did not constitute a denial or interference with Chernesky's rights. *Cf. Sutherland v. Glob. Equip. Co.*, 789 F. App'x 156, 159 (11th Cir. 2019) (affirming summary judgment on FMLA interference claim where the employer approved the plaintiff's multiple requests for FMLA leave and the plaintiff's "time sheets show she took three to four days of intermittent FMLA leave each month following approval," along with a three-day block of leave).

Next, Chernesky cites *Holtrey v. Collier County Board of County Commissioners*, in support of his argument that the City interfered with his FMLA rights when Clinghan and Ilczyszyn allegedly asked him about his

medical condition.  No. 2:16-CV-00034-SPC-CM, 2017 WL 119649 (M.D. Fla. Jan. 12, 2017).  But this case differs from *Holtrey*.  There, defendant breached plaintiff's right of confidentiality by disclosing plaintiff's protected medical information during a staff meeting plaintiff did not attend (without permission), which resulted in plaintiff's coworkers making jokes and obscene gestures about his condition in front of him.  *Id.* at *1.  Chernesky's argument on this point is unavailing.

Nor has Chernesky shown that the City interfered with his FMLA rights by "demoting" him.  The evidence shows that the perceived "demotion" reassigned some of his responsibilities, but it did not change Chernesky's title, classification, pay rate, or benefits.  He has not explained how his FMLA rights were at all affected by the City's action.  Because Chernesky has not shown that the realignment interfered with his FMLA rights, he has not stated a claim for FMLA interference.  *See Strickland*, 239 F.3d at 1206.

Even if Chernesky stated a prima facie case on the realignment, the City would have implemented the realignment regardless of Chernesky's leave request.  Clinghan described the dysfunction of the survey department, his perception the department was harmed by Chernesky's job performance, and the added workload the development boom placed on the survey department.  What's more, Ilczyszyn explained the survey department realignment was only part of a larger reorganization of the public works department, meant to

17

maximize efficiency and appropriately allocate resources.  The City's decision to reorganize the survey department was reasonable and wholly unrelated to Chernesky's FMLA leave, so his FMLA interference claim fails.  *See Herren*, 820 F. App'x at 905.

So the City is entitled to judgment on Count 2.

## B.  FMLA Retaliation

For FMLA retaliation claims, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207.  The employer must *intend* to retaliate.  *Id.*  When (as here) a plaintiff offers no direct evidence of retaliation, courts use the *McDonnell Douglas* framework.  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

Under *McDonnell Douglas,* the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802.  If he does, the burden shifts to the employer, which must produce evidence of "some legitimate, nondiscriminatory reason" for its employment decision.  *Id.*  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted,' and 'drops from the case." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006) (cleaned up). "The burden then shifts back to the plaintiff to show that the employer's

proffered reason was not its true reason, which merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against her." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted).

### 1. Prima Facie Case

A plaintiff must show: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to a protected activity." *Pereda v. Brookdale Senior Living Cmty., Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012) (citation omitted). A causal relationship exists when the relevant decisionmaker knew about the protected conduct, and the protected activity and adverse actions were not wholly unrelated. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017).

As an initial matter, Chernesky argues both his "demotion" and his termination constituted retaliation. But the realignment of the survey department was not a "demotion," and it did not constitute an adverse employment action. Establishing an adverse employment action requires the employee to "show a serious and material change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances." *Porterfield v. Soc. Sec. Admin.*, No. 20-10538, 2021 WL 3856035, at *5 (11th Cir. Aug. 30, 2021) (quoting *Davis v. Town of Lake Park,*

19

245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington Northern v. White*, 548 U.S. 53 (2006)).  And the adverse effect on plaintiff's employment must be tangible—a speculative impact will not suffice. *Porterfield*, 2021 WL 3856035, at *5.

The department realignment did not create any material change in the terms, conditions, or privileges of Chernesky's employment.  Nor did his job title, job classification, rate of pay, and benefits change.  He remained a manager "[i]n pay and in title and in function." (Doc. 30-2 at 6).  Chernesky has not shown that the realignment caused a tangible adverse effect on his employment, so he has not stated a prima facie case with respect to the realignment.

Turning to Chernesky's termination, the City argues Chernesky cannot show a causal connection between his exercised FMLA rights and his termination because there is no evidence that his disability was ever considered when the City decided to terminate Chernesky's employment.

But Chernesky responds that genuine issues of material fact exist about whether the City retaliated against him.  Chernesky contends the City became frustrated with his medical condition and his continued need for leave, especially given the unpredictable nature of his condition.  He argues the City unlawfully implemented his FMLA leave and was "seeking ways to terminate [him] in light of his need for leave." (Doc. 32 at 17-18).  And he points to the

close temporal proximity to his continued intermittent leave, his impending need for extensive leave, and his termination.

It would be possible for a reasonable jury to view these facts—especially the events of October 2019—as falling dominoes, beginning with Chernesky informing Ilczyszyn of his upcoming surgery and the extended leave that would follow, concluding with Chernesky's termination.  It is also possible that a reasonable jury could believe the City's narrative: that Chernesky's unilateral and insubordinate disabling of the online benchmark network led to his termination.  This is a genuine issue of material fact.

### 2. *Legitimate Nondiscriminatory Reason*

When the plaintiff makes a prima-facie showing, the burden shifts for the defendant to "articulate a legitimate, nondiscriminatory reason" for the firing.  *Gulf Coast*, 854 F.3d at 1271 (citation omitted). An "employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons.' " *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citation omitted). Rather, the reason must simply be "one that might motivate a reasonable employer." *Id.* at 1030.

It cannot be overstated that courts "do not sit as a super-personnel department" second-guessing employers' business decisions.  *Id.* at 1030 (citation omitted).  Every employer has the "right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v.*

*WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019). In that vein, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.*

On October 11, Chernesky told Ilczyszyn he would need surgery and would be taking upwards of three months of leave. On October 17, Clinghan and Ilczyszyn told Chernesky about their plans to realign the survey department. On October 18, Chernesky made his FMLA leave request official; he then drafted a screed that attributed the benchmark network's deterioration to Clinghan's leadership decisions, and he stated that the network was no longer "safe to publish" online. (Doc. 30-1 at 35). On October 21, the survey department was officially realigned. On October 30, Chernesky stated he did not know the benchmark network was disabled and received a direct order to help restore it, which he ignored. On November 4, Chernesky circulated his benchmark-network memo. On November 5, Chernesky received his second direct order to help restore the benchmark network; he refused to follow that order too. On November 12, Chernesky received a pre-disciplinary notice. And on November 25, he was terminated.

The City states it terminated Chernesky because he violated several departmental rules and personnel regulations by refusing to restore the

benchmark network to the City's website and asserting the data belonged to him and not the City. The City has met its burden of producing a legitimate, nondiscriminatory reason for Chernesky's firing.

### 3. Pretext

After the defendant provides an acceptable reason, the burden again reverts to the plaintiff to show "that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination." *Gulf Coast*, 854 F.3d at 1271. "To show pretext, [plaintiff] must 'come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Id.* at 1274 (quoting *Chapman*, 229 F.3d at 1024).

Whether the employer's decision is wise or fair is irrelevant. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). So "quarreling with the wisdom" of the reason is futile. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).

"A reason is not pretext for retaliation 'unless it is shown *both* that the reason was false, *and* that retaliation was the real reason.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) (cleaned up). To make that showing, the "employee must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. Evidence "significantly probative" of pretext is necessary. *Brooks*, 446 F.3d at 1163 (citation omitted). One can "establish

pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Gulf Coast*, 854 F.3d at 1274 (citation omitted).

Chernesky argues inconsistencies in Clinghan's deposition testimony reveal the City's reasons for his termination are pretextual. He relies on statements Clinghan made in his deposition that publishing no benchmark data would be better than publishing wrong benchmark data. (Doc. 30-1 at 12). Chernesky contends this is a concession that supports his opinion that the data should not have been published and is, therefore, an admission of pretext.

But given all the evidence, there is ample support for the City's articulated nondiscriminatory reason for terminating Chernesky. From the City's perspective, Chernesky was an ineffective manager who unilaterally took offline a public resource and then insubordinately refused directives to restore it. Whether or not Chernesky unilaterally disabled the benchmark network and then refused to restore it, the City's decision to terminate him on that basis is a legitimate reason this Court cannot second-guess. *See Alvarez, 610 F.3d at 1266* (When employee misconduct is employer's stated reason for its action, courts should focus on employer's beliefs and whether employer was dissatisfied with employee for nondiscriminatory reasons, "even if mistakenly or unfairly so."); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470

(11th Cir. 1991) (The inquiry is not whether employee was guilty of misconduct but whether employer in good faith believed so, and whether this belief was the reason for the termination.).

Given the evidence, Chernesky simply has not met his burden of proving the City's stated reason is unworthy of credence. So the City is entitled to judgment on Count 3.

## C.  FCRA Disability Discrimination

FCRA claims supported by only circumstantial evidence of discrimination are also evaluated under the *McDonnell Douglas* burden-shifting framework. *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1336-37 (11th Cir. 2021); *Greenberg v. BellSouth Telecomms, Inc.*, 498 F.3d 1258, 1263-64 (11th Cir. 2007); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007).

Chernesky argues his "demotion" and termination resulted from the City's discriminatory animus. As stated previously, he cannot make a prima facie case on the realignment because it did not constitute an adverse employment action. And, as with his FMLA retaliation claim, because Chernesky has not met his burden of presenting sufficient evidence to create a genuine issue of material fact about whether the City's stated, nondiscriminatory reason for his termination (his insubordinate refusal to

restore the benchmark network to the City's website) is pretextual, his FCRA discrimination claim also fails.

So the City is entitled to judgment on Count 1.

## CONCLUSION

Chernesky has not met his burden of presenting sufficient evidence to create a genuine issue of material fact about whether the City's stated reason for terminating him was pretextual.   His FMLA retaliation and FCRA discrimination claims, therefore, fail.   Chernesky has also failed to make a prima facie case of FMLA interference (while the City has met its burden of establishing a lack of a causal connection between Chernesky's leave request and its realignment of the survey department), so that claim fails too.

Accordingly, it is now **ORDERED:**

1.  Cape Coral's Motion for Summary Judgment (Doc. 25) is **GRANTED**.

2.  The Clerk is **DIRECTED** to enter judgment for the City of Cape Coral, deny any pending motions as moot, terminate all deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on September 20, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record

26